Good morning, Your Honors. May it please the Court, Mary Ann Dugan for the Plaintiff's Appellants. I'd like to reserve five minutes of my time. I took the liberty of bringing a map. I don't know if you want to look at it, but it is in the record at ER 184 to 85 maps that are fundamentally. Yes, we've seen that in the record. As you know, Your Honors, this case is primarily a NEPA case on appeal. The primary issue on appeal is whether the Forest Service — I'm sorry, the BLM should have done a full environmental impact statement. And as you know, I'm sure the test for that is whether the project may significantly impact the environment. There are several factors here which argue for a full environmental impact statement. One of the factors is the unique characteristics of the geographic area. There's a wild and scenic river that's being impacted. It's a 33-mile fly fishing only area. It's a riparian reserve, as established by the Northwest Forest Plan. It's an area of critical environmental concern. All of those designations established by the federal government. There is old growth that will be affected in the Susan Creek area when the 100-foot bridge is built across that creek. And in fact, one of the BLM's own staff expressed concern about the old growth. That's in the record at ER 101. There's also the Fish and Wildlife Service's finding that this project is likely to adversely affect the Northern Spotted Owl, which is an endangered — threatened species under the Endangered Species Act. And that's in the record at ER 90 and 99, and more fully at SCR 138. This is suitable habitat, which is a term of art for the Northern Spotted Owl. And the Fish and Wildlife Service, at those pages, went on at great length as to how this project will affect the owl. The owl is in the action area. That's in the record at SCR 135. This is also entirely in critical habitat for the threatened coho fish, salmon. That's in the record at ER 152 to 59. And the government's response to that is that the impacts to the fish will only be temporary. But as we explained in the reply brief at page 17, this Court has held that even temporary impacts to a threatened or endangered species can be significant. There's also extreme controversy that was generated. As I noted, the BLM's own staff at page 101 of the record expressed concern over the impacts to old growth, the Fish and Wildlife Service found likely to adversely affect the spotted owl. The appeal, the administrative appeal, was filed not only by the landowners who are in the room today, but also by the Steamboaters, Umpqua Watershed, and Cascadia Wildlands Project. And that's in the record at AR 68. The other major problem with this under NEPA is that the BLM unreasonably segmented the parking lot from the remainder of the project. It was the parking lot that generated a great deal of concern because of the number of trees, many of them large, that will have to be removed. And so they simply removed it from the project. But they didn't actually say they're not going to do it. They said we are deferring the parking lot proposal. This is in the record at ER 85. They said we're deferring it, quote, to assess changes in recreational user needs and patterns based on the new recreation opportunities the Tioga Bridge and Emerald Trail will provide. But as... What's unreasonable about that? Well, as this Court held in the National Parks Conservation Association v. Babbitt case, 241 F. 3rd, 722, at 735 this Court noted that it's exactly backwards to create the impacts to the environment and then study them. So that's one reason that's unreasonable. The other reason is this is a classic example of segmentation, as this Court found in the Thomas v. Peterson case 30 years ago, where the Court held that if you're going to have a timber sale, obviously you have to get trucks up there, so you're going to have the roads that go with it. And you can't segment those kind of connected actions in order to make the project look less significant than it is. Isn't there already a parking lot up the road? There is a parking lot. The parking lot was to be expanded so that larger vehicles could maneuver and turn around, is that right? That's correct, Your Honor. And the BLM did project not only a 25 percent increase in visitors from this project, which is in the record at 142 to 143, but an increase in equestrian use, and that's in the record at ER 160. And so if you have a horse trailer, there's nowhere to park it in this parking lot, and their solution is, in the record at SCR 65 and 68, that the horse trailers can park across the road and then cross this 55-mile-an-hour highway to come to the new bridge. And it was unreasonable of them to just arbitrarily take the parking lot expansion out of the project when they originally had it in the project. The biological opinion from the Fish and Wildlife Service is based on the assumption that the parking lot is there. It's clear that the only reason they took it out is because it generated so much controversy, and they want to just split it up. It's a classic segmentation problem. So you call it a bait-and-switch kind of a thing. It is a bait-and-switch. Now, all of the impacts and all of the problems that you identify were on the table and considered by the agency during its decision-making process. Am I correct about that? To some extent. I would argue, Your Honor, that they swept a lot of this under the table. But the problem is they It was on the table before they swept it under. But they did not do a full environmental impact statement. And what was the reasoning of the agency for not doing a full environmental impact statement, given all of these problems that you've identified? Well, they minimized, as they so often do, they minimized each and every one of these problems. For example, saying the impacts to the coho will be temporary, the impacts to the owl will be, quote, minor. If you add up all of these impacts, though, Your Honor, it's a classic situation where we need a full environmental impact statement. The increase in visitors alone of 25 percent, that's 10,550 visitors a year expected. You go back again to the law that we discussed earlier. You know, we're not supposed to substitute our judgment for the judgment of the agency. Those policy decisions are for the agency to make, right, wrong, or indifferent. And so long as they take a hard look at all of these things and come to a conclusion that's not arbitrary or capricious or otherwise in violation of the law, the agency stands. That's not our rule. This is what Congress said. This is what the Supreme Court has said. That's correct, Your Honor. So why wasn't this a hard look at all of these things that you've identified? They were on the table. They saw them. They looked at them. What was arbitrary or capricious? That's an extremely deferential standard of review, as you well know. I would argue, Your Honor, that the requirement that they prepare a full environmental impact statement if there may be significant impacts is not solely a – it is not a deferential review. It's a review of whether there may be significant impacts. And their judgment was there won't be. Well, their judgment was that each – We may not like their judgment. We may not like it either. Lots of people may not like it. But it's their judgment.  of review. We've been told stay the heck out of these things unless they really made a gigantic mistake that anybody with a room temperature over IQ – under IQ can even spot. I mean, it's that deferential. Well, Your Honor, if the Court were simply to defer to every time the government prepared an EA – We don't. We don't. No, it's arbitrary or capricious. Right. Correct. And so where they have – where the BLM has refused to acknowledge that each – that these things add up to a picture of something that may significantly affect the environment, that is where this Court has repeatedly rejected environmental assessments. In the National Parks case, it was a very similar situation where there were going to be a bunch of cruise ships coming into the – sorry, the – it was an area way up north. And the government said, well, we'll study the impacts of that later. We don't think it's going to have significant impacts. And this Court said, well, you can't just defer that sort of study and you can't – you can't just minimize and poo-poo these impacts. You know, if you look at the environmental assessment, the government's downplaying of the impacts is very conclusory. It's a classic example, for example – I'm sorry – of saying that the impacts to the fish and sedimentation to the water will be temporary. That's – that was addressed by this Court in the Pacific Coast Fishermen's Federation case. There has to be a point, Your Honors, at which when you get a picture this compelling of this many significant impacts, the government has to be reminded that it's time to do a full environmental impact statement. This Court noted in the Kern case a few years ago that there are 10,000 environmental assessments prepared every year and only 100 environmental impact statements. In that case, in the Kern case, the Court pointed that out to note the importance of the review that goes on in an environmental assessment, that it has to be rigorous. But it also points out that there's been a trend in this country toward the government not preparing full environmental impact statements and repeatedly minimizing the impacts. While this matter has been pending on appeal in this Court, has the project continued? To some extent, Your Honor, yes. There is still the 100-foot bridge across Susan Creek that requires the clearing of old growth. It has not been completed. There is also some other minor pieces that remain to be done. In addition, the parking lot, of course, should have been considered along with this. Work on the bridge. Pardon? Work on the bridge. The bridge is completed, sadly, yes. You want it torn down? No, no. What do you want? Okay. So this Court has explained that as long as there is some meaningful relief that the Court can grant, that the case is not moot. What's the relief that you're asking? The relief that we would ask is that the project be stopped, including the bridge across Susan Creek and EIS, that they come up with a plan to mitigate the conflicts between the residents and the hikers, and that they also remedy the bridge created a situation where the classic fly-fishing pool that was below the bridge can no longer be accessed. The path is obliterated and there's just a sheer drop. Those kind of things could be clearly mitigated. And this Court has said that mitigation, even when the logging was complete and the timber sale, is enough to the ability to do mitigation is enough to keep the case live. For example, in the ONRC v. BLM case, 470F, 3rd, 818, sorry, 9th Circuit, 2006. And the Court, this Court has noted that defendants in NEPA cases face a particularly heavy burden in showing that the case is moot. That's in Canada. Well, so there's still work to be done on Susan Creek. Yes, Your Honor. How about the road? The road's been realigned. Been realigned. Yes, it has. And the bridge is up. The bridge is up, yes. And there can be, though, mitigations as far as the impacts to the landowners. For example, the newly the new 10,550 people could be kept off of private property by way of a fence. There's private property very close to the other side of the bridge. How far are the bowlers from the bridge? The bowlers live downstream about a mile. Less than a mile. Less than a mile. Their property doesn't abut this area, does it? No. It abuts the general area. And then somebody else who's in the courtroom with us does abut the path. So there's a lot of, there's not a huge number of landowners, but there is a very significant impact to the landowners from the fire danger, from the trash, from people not using restrooms. I won't go into detail. And so that, the Wild and Scenic Rivers plan for this river stated that the BLM would come up with a plan to mitigate those conflicts between recreationalists and the landowners. And this would have been a great opportunity for them to do that. They promised they would do that, and they have not done that. So that would be another type of mitigation. Hold on a second. I want to make sure I understand that. You've described all these problems that require a fence and a path and everything like that. You say BLM has promised to mitigate some of these things? In the Wild and Scenic Rivers plan, which came out a long time ago  one of the major issues was we will come up with a plan to address the conflicts between people using this backcountry and the river and the nearby landowners. Have you recently approached BLM saying, hey, these are some of the things that we might need to mitigate this problem? Throughout this process, my clients and other landowners have attempted to work with the BLM. The BLM, in response, has just pushed this project through, has sent letters to wrong addresses, to dead people. There's not been a collaborative process. Have you recently approached BLM and asked for these mitigation efforts and effects that you've just told us about? I'm not aware. I've only dealt with the appeal. I'm sorry, Your Honor. I don't know the on-the-ground situation with the talking to the BLM. Okay. And I see that I have five minutes left, so if I could reserve that time for anybody. That's fine. Thank you. That's fine. We'll hear from the government. Good morning, Your Honors. May it please the Court. Sean Martin from the U.S. Attorney's Office for the Federal Government Appellees. This Court should affirm the district court ruling granting the government's cross-motion for summary judgment. As the district court recognized, the Interior Board of Land Appeals rationally concluded that BLM had complied with all the relevant statutory requirements. I want to put the facts of this project into context, Your Honors. This is a small project on a narrow ribbon of land between the North Umpqua River and Highway 138. This project is within an already designated Susan Creek Recreation Area. It involves a 0.8-mile non-motorized recreation trail. It involves a non-motorized trail over the North Umpqua River on existing bridge piers that have been visible from the road for about 50 years since there was a washout of the bridge that had been there. This is actually kind of like a replacement bridge. Yes. Yes, it is, Your Honor. Looking at the photos in the environmental assessment depicts the bridge before it went down and the design for the new bridge, and there's quite a bit of similarity. I would note that the new bridge, under the requirements in the EA, is in the uses wood, uses muted tones, no shiny surfaces. The point is to have this bridge and all of the materials blend in to the colors and to the landscape of the recreational river corridor. There's been some opposition to this project, Your Honors, as Ms. Dugan made clear. It's also apparent from the record that there's a lot of broad support for this project from people including Douglas County Commissioners, the Douglas County Sheriff, the Chief Medical Officer of the rural, the Glide Rural Fire Protection District, bicycle groups, outdoor groups, and local businesses, including a bed and breakfast that are on the North Umpqua River. This Court has always been very careful to draw a hard line between opposition to a project and actual bona fide scientific controversy that would require an EIS. In this case, there's nothing in the record from any State agency or any Federal agency expressing opposition to this project. Ms. Dugan emphasized the Fish and Wildlife biological opinion. That biological opinion disclosed and the BLM disclosed that this project is going to impact a negligible portion of owl nesting and foraging habitat. I believe the percentage is 0, pardon me, 0.03 percent of that portion of owl habitat in this region. No owls are going to be taken. No critical habitat is going to be removed. This Court has been really clear in the context of NEPA that some negative impact on some individual members of the species does not rise to the level of significance requiring an EIS. In particular, in 2006, in the Epic decision, this Court addressed a nearly 600 acre logging project that would remove 14 acres of nesting critical habitat and cause the take of three pairs of owls. This Court held that an EA in that case was sufficient, and this Court held that in the context of NEPA, significance is addressed species-wide. In this case, we have a 103-acre project area, no critical habitat impacted, no nesting impact, and no owls being taken. The BLM got it right in issuing an environmental assessment. The BLM also was up front and considered that this is a riparian reserve area. This is an area of critical environmental concern. This is a wild scenic river area. And I would point the Court's attention. This was in the government's brief, but the Presidio Golf Club case, this Court held that when the BLM took factors into account in its NEPA analysis, that that's meeting NEPA. Here, it's important to recognize that the area of critical environmental concern is managed for recreational use, and that's what this project is all about. How about the issue that counsel raised regarding segmentation, deferring the modifications to the parking area, taking them out of this particular activity? The Court recognizes the parking lot expansion is not on the table. Right. It's important to recognize a couple of things, that the Fish and Wildlife Service took this whole project into account in terms of the spotted owl as if there were going to be a parking lot expansion, and still determined that there aren't going to be any take of the owls and the same negligible impact on the roosting habitat. What the BLM committed to in this case, Your Honors, in the decision, is that if there's ever going to be down the road at some point a proposed expansion of a parking lot, that's going to go through NEPA anew. It's going to go through an environmental assessment process, and the public is going to have an opportunity to be a part of that process just like it did in this process. Well, her complaint is, as I understood her argument, is that by that time there will be an increased use of the recreational area, the bridge, and whatnot. So then it's a different situation. It may be a different baseline when that analysis is done. It's not – I wouldn't – it's not – there's no proposed action on the table. This is something the BLM made clear on the record, that it wants to look at how people are going to use this, this recreation area with the new bridge, with the new trowel. How is it going to be used, and what is going to make sense in terms of any potential future proposal? But in terms of what it's going to be, if anything, there's nothing in the record saying that's going to happen. There's no commitment that that's going to happen. So the same – the existing parking lot just remains as is? I mean, there's been no changes to it? Correct. Other than the gazebo or something? Correct. The gazebo is in place. The record, as the district court recognized, Mr. Bowler stated that there were 32 spaces in the existing parking facility. And his point to the BLM was at a maximum, only five of those spaces are taken. So that leaves 27 spots available by the Bowler statements. If there's a 25 percent increase in use or even a 100 percent increase in use here, there's still plenty of spaces in that parking lot. Okay. Your Honor has asked about the project implementation. I would agree with – for the most part with what Ms. Dugan said. The Tioga Bridge over the North Umpqua River is now in place. It's being used every day by the public. The highway has been – the 400 feet of highway has been realigned. The trees have been felled for that purpose. There are, as Ms. Dugan indicated, the bridge over Susan Creek, approximately 90 to 100 feet. That bridge has not been put into place, but the footings are in place. So it simply needs to be dropped in. The trail is, other than the final approach to the footings that are in place, the trail is entirely completed for this project. You don't contend that the case is moved, do you? Not at this point, Your Honor, but that may change. And I also want to make the Court aware that in the 13 months since the district court ruled, the Bowlers have not requested from the district court or this court any type of injunction pending appeal. Right. And that's a relevant factor in a – in a mootness analysis. So what about the concern that was – that counsel raised with respect to the impact that – that this increased activity might have on the neighboring landowners? And Judge Trott's question about what – I have to raise an initial concern, Your Honor. I'm not aware of a – of a site in the district court record or on this record regarding the river management plan establishing a requirement for the BLM to engage in a particular mode of interaction with – with private landowners. That said, I can represent that the BLM is always interested in working with the local  I'm not so – Can you encourage the BLM to sit down with these landowners who seem to have a grievance concern on the decidement of any possible mitigation that can take place that satisfies their concerns? I certainly can. That might be a good idea. I would certainly encourage them to sit down with people who – who clearly care about the river corridor, have their own interests, but obviously care enough to bring this through the courts. Do we know if there's been any increased use in the – in the trail as a result of the building of the bridge? Already? Yes. I don't – I don't know that there has. I would suspect – I can't say with certainty, but I would suspect not really because the – because of the missing bridge, the Emerald Trail is not – Fully accessible? Right. From the – from the parking area. Right. You can't get from the parking area to using the new trail to the new bridge over the North Umpqua River. So I would suspect it's not – there's not been much of an impact as of yet. I want to also emphasize, Your Honors, that it's true that this part of the river, there's eight miles in the river corridor that are managed wild and scenic by the BLM. The rest is the Forest Service, the remaining 24 or 25 miles. And it's correct that this – this river is fly fishing only in terms of the type of fishing that can be done on the river. But this is also managed for mountain biking use, camping, sightseeing, photography, hiking. That's what the BLM wanted to do with this project, is recognize that this is a river with lots of different recreational opportunities. There's trailheads very near this section of the corridor. And what the BLM analyzed in the EA was that this is going to relieve some of the congestion in some of the other areas and help spread out some of the use. It will – it will bring an increase to this part of the river corridor. But the BLM made a rational determination that it's not going to invite public – the public into the river corridor in the first instance. In other words, if people are already using this recreational area, they might use these new facilities. But new people aren't going to make the trip from Portland, let's say, just to use the Tioga Bridge. They had one other claim, the Wild Rivers, Scenic Rivers Act. Pardon me, Your Honor? They had another – their other claim was dealt primarily with the Wild and Scenic Rivers Act. Yes. An initial point – a legal point, Your Honor, that the government isn't entirely clear on which provision was allegedly violated in the statute. Beyond that, in the spirit of the claim, it's – it appears to be a claim about the visual impacts of this project. And I have two points. The first is that this bridge is going in in an area of the river where there already are some evidence signs of prior mankind. Let me put it that way. This – this bridge is on top of those existing piers. The piers were visible before. The piers and the bridge will be visible now. Beyond that, the bridge is going to open up some new scenic opportunities for the public. So the BLM, you know, rationally determined that it serves the scenic values of this recreational corridor and this river, because it's at an area where there already has been some degree of impact, and secondly, it allows an expanded use of the river that allows the public some new scenic vistas.  I will submit, and I ask the panel to affirm the district court ruling. Thank you. Thank you, Your Honors. As an initial matter, I'd like to note that we did seek a preliminary injunction in the district court while the merits were still pending, and that was denied, and then we appealed that, and that was denied as well. Lack of jurisdiction. The Wild and Scenic Rivers Act, 16 U.S.C. 1281, states that the government must protect all outstanding recreational values, resource values, and here that would be scenery and fisheries. And the Wild and Scenic Rivers Plan stated that there was not going to be any realignment of the road. That's in the ER at 194, and the BLM promised that the visual quality objectives would be addressed. But, you know, the BLM itself ---- What does realignment of the road mean? I mean, what did they do? What does it look like now? I mean, I'm not seeing it. It isn't clear to me. Can you describe it? We do actually have photos. They're not in the record, so I'm hesitant to, you know, offer them without permission, but we have photos of what the road realignment looks like. You don't have to. You don't have to, Jeff. I've seen it on the road. In the ER with ---- Yeah. Somebody says realignment. I don't know what that means. My brain tells me it may be one thing, and I don't know what it means. Well, so 400 feet were rebuilt and moved, and it was to make way for the access onto the new bridge. And there's some photos of showing the new access right next to the new road. So, okay. And what's the problem with the realignment? Well, it changes the ---- it moves the road further from the Wild and Scenic River, but it also changes the visual quality because of that, because now there's this ---- How far does it move it? I'm not sure how quite how far it moved it. Have you seen it? Have I been up there? I've seen the photos. But you haven't been there. No. Well, I was there before it was realigned. Go hold up the photos so we can see it. Okay. Sorry. So this is ---- this shows the access to the new bridge and the newly realigned road. And there's some other photos that show it. It looked like it was moved all that much to me. It was moved ---- Ten feet? Ten feet. Okay. So it required, you know, reconstruction and construction in the Wild and Scenic River's area and the riparian reserve. Okay. So that was part of the impacts of the project. There's also a photo in here of the parking lot, you know, unchanged to give you a visual of that. The, you know, the BLM itself originally in the Wild and Scenic River's plan had planned to do a suspension bridge at Susan Creek Campground. That's in the record at ER 190 to 195. And that would have been right where all the people already come, where they park, where they camp, and it wouldn't have been visible from the road. And so that's another NEPA issue that I did not mention in my opening. But it's relevant to the fact that they violated the Wild and Scenic River's Act because they did not look at their own alternatives that they had suggested way back when this plan was first developed. The bridge is similar, but it's elevated from where the piers used to be, so it's much more visible. And it goes over a prime fly fishing pool. And we addressed all this in the opening brief. As far as critical habitat for the spotted owl, as the Fish and Wildlife Service explained in the record on page SCR 136, this was designated as critical habitat, this entire area, for the spotted owl until Will it result in the take of any spotted owl or a pair of spotted owls? No. And it's very, very, very rare for the Fish and Wildlife Service to find that a particular project is going to take owls. But they did find it's likely to adversely affect. And they did explain, the Fish and Wildlife Service explained that this was critical habitat until the designation was changed in 2008 under the Bush administration, and that that rule is actually, that change is actually still being litigated. It is called suitable habitat, meaning that the owl is expected to use it for nesting and roosting, and that's in the record at SCR 136. And, Your Honor, I would point out the parking lot expansion is, quote, on the table because it's simply been deferred, to use the BLM's own word, and that's in the record at ER 85. And there's nowhere for horse trailers to park or RVs or boat trailers. And it's not like we're saying, oh, we would love more of that. But the problem is, those people are going to come, they're going to park across the street. It's creating these across the road, and it's creating these other problems that the BLM swept under the rug. Is there a launch area in connection with that bridge for boats or a takeout? For rafts. Yeah, for rafting. Rafting. Yes. So people have the big rafts on their trailers and such. So unless you have any further questions, I would ask you to reverse the district court. Thank you. Thank you. Thank you, counsel. We appreciate your arguments. The matter will stand submitted and will be in recess for a while.
judges: Alarcon, Trott, Paez